# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**TIMOTHY M. OSMAR,**

        **Plaintiff,**

**-vs-**                                               **Case No. 6:12-cv-185-Orl-DAB**

**CITY OF ORLANDO,**

        **Defendant.**

_____

# MEMORANDUM OF DECISION

This cause came on for trial before the undersigned[1] on March 29, 2012. Plaintiff filed suit pursuant to 42 U.S.C. § 1983 seeking a declaratory judgment that Orlando City Code § 43.71 – the provision under which he was arrested on two occasions[2] – has been unconstitutionally applied against him in order to suppress his political speech activities. Plaintiff also sought an injunction to keep the City from enforcing § 43.71 against him. Doc. 1.

Plaintiff was arrested for writing in chalk on the public sidewalk near City Hall. The City of Orlando ("the City") argues that as Plaintiff's chalk messages violated § 43.71, which prohibits writing and marking on the sidewalk, he was properly arrested. Because the Court finds that § 43.71 does not apply to Plaintiff's conduct, the Court finds in favor of Plaintiff against the City for the reasons set forth below.

---

[1]The parties stipulated to combining the hearing on the requested preliminary injunction with the trial on the merits and to bifurcation of the issue of damages. The parties consented to trial by the undersigned Magistrate Judge on March 7, 2012, and the District Judge entered an Order approving consent to jurisdiction on March 8, 2012. Doc. 46, 47.

[2]Section 43.71 of the Orlando Code of Ordinances prohibits writing, printing, marking, painting, stamping or pasting any sign, notice, or advertisement upon the surface of any sidewalk or paved street in the City.

At trial, Plaintiff offered no live testimony, but offered as exhibits the Declarations of Plaintiff, Mayor Buddy Dyer, and the Informations for Plaintiff's December 15 and December 22, 2011 arrests. Doc. 67. The City offered the testimony of Byron Brooks and Kyle Shephard; and the Declarations of Police Chief Paul Rooney, arresting officers Sergeants E. Payne and J. Blye; and the Arrest Affidavits[3]. Doc. 68. Based on this testimony and the exhibits admitted into evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

# FINDINGS OF FACT

Plaintiff is a member of a national political movement known as "Occupy Wall Street" of which the local "Occupy Orlando" group is a part. On December 15, 2011, Plaintiff was writing in chalk a political message[4] on the sidewalk in front of City Hall when a police officer approached him and told him that he was not allowed to write in chalk on the sidewalk. Plaintiff continued writing the political message, but before he could complete what he was writing, he was arrested for violating § 43.71. On December 22, 2011, Plaintiff returned to City Hall Plaza and wrote a second time in chalk on the sidewalk. He was arrested again for violating § 43.71, the second time for writing: "All I want for Christmas is a Revolution, #Occupy." No other person has ever been arrested or charged under §43.71 since it went into effect in 1985. The official "Complaints for Violation of Municipal Ordinance" charge Plaintiff with "writing or painting advertising matter on streets and sidewalks," in violation of § 43.71.

---

[3]The facts are for the most part undisputed, thus, the parties submitted as unopposed exhibits several declarations from the individuals involved in the arrests and the City's mayor.

[4]The City did not dispute that the messages Plaintiff wrote were political.

The City considers the plaza in front of City Hall[5] to be a public park filled with concrete walkways and sidewalks ("the Plaza"). The Occupy Orlando group has protested peacefully in the Plaza holding signs expressing their messages in the Plaza, without any arrests. The City has devoted financial resources to maintaining the esthetics of the Plaza area. The arresting officers did not arrest Plaintiff based on the specific content of the messages he wrote in chalk on the sidewalks in the Plaza, although Plaintiff was admittedly part of the Occupy Orlando demonstration at the time he wrote the messages.

For several years, the Orlando Rotary Club has conducted an annual sidewalk chart art festival. To conduct the festival, the Rotary Club first applied for and received the appropriate permit from the City[6]. At the Rotary Club festival, the Club invited a limited number of artists to draw in sidewalk chalk on City sidewalks within the limited permitted area for the festival, which some years included the Plaza. At the Rotary Club's art festivals, the best chalk drawing received the "Mayor's Award." Although the Mayor himself did not select the Award's recipient, staff from the Mayor's Office would select the best work of art, and notify the Rotary Club, who would present the Award (that the Rotary Club funded) to the winner. None of the artists who participated in the Rotary Club's art festivals were arrested for defacing public property.

In 2009, when the Orlando Magic competed in the NBA post-season playoffs, the Office of the Mayor issued two press releases encouraging downtown businesses to showcase their community spirit and pride for the Magic team by decorating the sidewalks in front of their main entrance with

---

[5]The area in front of City Hall is also referred to as City Commons Plaza in the police reports and by the arresting officers.

[6]The City issued an 18A permit, which is required for gatherings where more than 100 people will be participating or where the gatherings are expected to attract 100 people. Apparently, the applicant applies for the permit at the Orlando Police Department and the application is put on the City Council agenda; there may be a cost for additional police required for the crowd and a bond may be required for clean up costs.

unique artwork in Magic colors, utilizing chalk. No one was arrested in connection with drawing chalk messages on the sidewalks in front of the businesses in support of the Orlando Magic during the 2009 playoffs.

# CONCLUSIONS OF LAW

### First Amendment Principles

In the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court of the United States articulated the essence of the First Amendment's protections:

> The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498. 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' *Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117. '[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions,' *Bridges v. California*, 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192, and this opportunity is to be afforded for 'vigorous advocacy' no less than 'abstract discussion.' *N.A.A.C.P. v. Button*, 371 U.S. 415, 429, 83 S.Ct. 328, 9 L.Ed.2d 405. The First Amendment, said Judge Learned Hand, 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.' *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943). Mr. Justice Brandeis, in his concurring opinion in *Whitney v. California*, 274 U.S. 357, 375–376, 47 S.Ct. 641, 648, 71 L.Ed. 1095, gave the principle its classic formulation:
>
>> 'Those who won our independence believed *** that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable

> government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.'

Id. at 270–71, 84 S.Ct. 710.

## Nature of Plaintiff's Activity

Plaintiff's delivery of his message invokes these core principles in nearly their purest form. Often, courts are called upon to apply free speech principles to surrogates for speech (*e.g.,* expressive conduct or the spending of money as the equivalent of saying something). Many such cases stray far from the basic civic values essential to a thriving democracy embodied in the guarantee of free speech. Whether or not one agrees with this Plaintiff's message (or even regards it as well expressed), the issues he has raised, publicly displayed in chalk, go directly to open debate of important public concerns: the organization of American society, equality of opportunity, and the proper operation of government. His place and manner of expression, displayed in chalk for a time, literally using the public square, likewise evoke the classic example of the exercise of free speech: the soap box orator who knows his words may be lost to the winds.

As an initial matter, the Court must consider whether the Plaza in front of City Hall where Plaintiff wrote messages on the sidewalk is a public forum, a place which, by tradition, has "been devoted to assembly and debate."

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). In these quintessential public forums, the government may not

> prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Carey v. Brown*, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980). The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *United States Postal Service v. Council of Greenburgh*, 453 U.S. 114, 132, 101 S.Ct. 2676, 2686, 69 L.Ed.2d 517 (1981); *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 535-536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980); *Grayned v. City of Rockford*, supra, 408 U.S., at 115, 92 S.Ct., at 2302; *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Schneider v. State of New Jersey*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

*Perry Educ. Ass'n v. Perry Local Ed. Ass'n*, 460 U.S. 37, 45 (1983). *See Hill v. Colorado*, 530 U.S. 703, 715, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (It is well established that traditional public fora include sidewalks, streets, and parks that the public has historically used for assembly and general communication). However, though a public sidewalk is presumed to be a public forum, "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government," and not all public sidewalks constitute public fora for First Amendment purposes. *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). Based on the facts presented at trial, the Court finds that the Plaza in front of City Hall where Plaintiff chalked his messages on the sidewalk is a public forum. *See Frisby v. Schultz,* 487 U.S. 474, 480, 108 S.Ct. 2495 (1988) (streets and sidewalks are the archetype of a public forum).

In a traditional public forum, "the rights of the state to limit expressive activity are sharply circumscribed." *Perry*, 460 U.S. at 45, 103 S.Ct. 948. A city may impose reasonable restrictions on the time, place, and manner of protected speech in a public forum as long as the restrictions (1) are content neutral, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information. *International Caucus of Labor Comm. v. City of Montgomery*, 111 F.3d 1548 (11th Cir. 1997) (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753-54, 105 L.Ed.2d 661 (1989)).

## Analysis of Orlando's Ordinance

Section 43.71 does not ban all graffiti or all writing of messages on sidewalks; it is limited to "advertising matter." Section 43.71 of the Orlando Code of Ordinances reads:

> Sec. 43.71. Writing or Painting Advertising Matter on Streets and Sidewalks
> It shall be unlawful for any person to write, print, mark, paint, stamp or paste any sign, notice or advertisement upon the surface of any sidewalk or paved street in the City.

By title and language, § 43.71 targets commercial speech and not other kinds of messages.

Plaintiff brings an as-applied challenge to the City's application of § 43.71 to his conduct.[7] A criminal defendant may challenge his arrest or seek to vacate his conviction by demonstrating a law's facial or as-applied unconstitutionality. *See, e.g., Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). An as-applied challenge does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right. *See, e.g., Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410, 411-12, 126 S.Ct. 1016, 163 L.Ed.2d 990 (2006) (per curiam); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758-59, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (an "as-applied" challenge consists of a challenge to the statute's application only to the party before the court). If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable. *City of Lakewood*, 486 U.S. at 758-59.

## Plaintiff's Chalked Messages Do Not Violate the Ordinance

The Court finds, first, that § 43.71 does not apply to Plaintiff's chalk messages. Second, the Court finds that the arrest of Plaintiff under § 43.71 violated his First Amendment right to free speech. Writing with chalk on the Plaza sidewalk – as opposed to painting or pasting a sign – is not permanent

---

[7] Notably, for present purposes, Plaintiff does not seek a determination that Section 43.71 facially violates the First Amendment nor that his activities are not subject to other City ordinances.

or long-lasting and can be washed away with water, or in a sub-tropical climate like Orlando, by wind or rain. Section 43.71 does not apply to Plaintiff's conduct because his messages did not involve "advertising"[8] and did not involve any "any sign, notice or advertisement." Accordingly, the application of § 43.71 to Plaintiff's chalk messages was improper as a matter of interpreting the Ordinance. In addition, the City's application of the Ordinance to arrest Plaintiff violated his First Amendment rights.

Particularly since the City has encouraged chalk messages and chalk writing by other groups whose messages showed their esthetic contribution, "civic pride," or "community involvement," use of the Ordinance to prevent ephemeral dissemination of political messages offends the First Amendment. The City has allowed and encouraged the writing of messages in chalk on the Plaza sidewalks as part of the Rotary Club art festival, endorsing a Mayor's Award, and the 2009 Orlando Magic Playoffs "chalk up the streets" campaign. *Cf. Mahoney v. Doe*, 642 F.3d 1112, 1118 (D.C. Cir. 2011) (upholding application of a content-neutral general defacement statute criminalizing "the conduct of defacing, defiling, or disfiguring property" as applied to plaintiff's use of chalk on the street in front of the White House). The City's encouragement of these particular uses of chalk demonstrates the fundamental difference between a temporary marking and a more permanent one (*e.g.,* carving, painting or gluing a message). The City may not selectively interpret and enforce the Ordinance based on its own desire to further the causes of particular favored speakers.

The Seventh Circuit discussed the dangers in excluding unpopular or minority viewpoints based on "economic concerns" which are driven by the popularity of the group's message in considering an as-applied First Amendment challenge:

> In *Chicago Acorn*, a group seeking to distribute leaflets and hold a rally on Navy Pier was denied a fee waiver even though the City had waived the fee for the Democratic Party's National Convention. The City justified its action by explaining that it was not

---

[8]The City's suggestion that Plaintiff's message amounted to advertising himself would create a useless tautology. Every message is in that sense self-referential.

-8-

> favoring the speech of the Democratic Party, but rather was motivated by purely economical concerns; "its policy is to waive fees for users who will generate large favorable publicity." [*Chicago Acorn v. Metropolitan Pier & Exposition Auth.*, 150 F.3d 695, 699 (7th Cir.1998)]. Applying *Forsyth*, we held that while the City's intent may have been innocent, the discriminatory effect on speech was too great to be permitted, *id*. at 701, because "a favorable publicity criterion is especially likely to have political consequences, since the only political users of the pier who will generate large favorable publicity are respectable, popular politicians and respected, well-established political groups; pariahs need not apply." *Id*. at 699. Accordingly, we concluded that in deciding whether to waive the fee, Navy Pier could not consider whether the event would generate positive publicity. *Id*. at 699.
>
> Both [decisions] illustrate that in determining access to a forum the criteria considered must be unrelated to the content of the speech and must not have the effect of excluding unpopular or minority viewpoints.

*Southworth v. Board of Regents*, 307 F.3d 566 (7th Cir. 2002). While the Seventh Circuit addressed political speech, and there is no evidence that the Rotary Club or Orlando Magic chalking was political[9], the principal holds true that the City cannot selectively enforce § 43.71 based on an individual's unpopular or minority viewpoint while encouraging other groups to participate in the same conduct.

Based on the foregoing, the Court finds that § 43.71 has been improperly and unconstitutionally applied against Plaintiff for writing on the Plaza sidewalk in chalk. The City and its agents are permanently enjoined from enforcing § 43.71 against Plaintiff for writing political messages in chalk on City sidewalks.[10]

Counsel are **ORDERED** to confer within 14 days concerning further proceedings, including, if necessary, a trial, as to damages and any other matters requiring resolution.

**DONE** and **ORDERED** in Orlando, Florida on April 13, 2012.

---

[9]A city may not treat commercial speech more favorably than political speech. *See, Café Erotica of Florida, Inc. v. St. Johns County*, 360 F.3d 1274, 1287 (11th Cir. 2004) ("[D]iscriminating in favor of commercial messages over political ones, without regard to the actual messages conveyed, is also content-based discrimination.").

[10]As noted above, this Court has no occasion in this case to consider the precise scope of this Ordinance in other contexts, nor the possible application of other (existing or future) ordinances or laws to Plaintiff's activities.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record